**[J-74-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 13 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 3585 EDA |
| | : | 2019 entered on May 10, 2023, |
| v. | : | affirming the PCRA Order of the |
| | : | Philadelphia County Court of |
| | : | Common Pleas at No. CP-51-CR- |
| DEREK MURCHISON, | : | 0913011-2002 entered on |
| | : | November 27, 2019. |
| Appellant | : | |
| | : | SUBMITTED: August 15, 2024 |


## OPINION


**JUSTICE WECHT**                                          **DECIDED: December 17, 2024**

Derek Murchison was convicted of first-degree murder[1] (and related charges) for the October 5, 2001, strangulation of Linda Willis and was sentenced to life in prison without the possibility of parole. Murchison later sought and obtained post-conviction DNA testing of various items found at the murder scene under the Post Conviction Relief Act ("PCRA").[2] Upon receiving the results, Murchison filed a petition for post-conviction relief, arguing that the new DNA test results constituted after-discovered evidence that entitled him to a new trial.[3]

---

[1]      *See* 18 Pa.C.S. § 2502(a).

[2]      *See* 42 Pa.C.S. § 9543.1 (entitled "Postconviction DNA testing")

[3]      *See* 42 Pa.C.S. § 9543.1(f)(1) (authorizing a petitioner to file a petition for post-conviction relief pursuant to Section 9543(a)(2)(vi) (relating to after-discovered evidence) at the conclusion of the DNA testing requested under Section 9543.1).

The PCRA court dismissed the petition, and the Superior Court affirmed. We granted allowance of appeal to determine whether the lower courts applied the correct legal standard for after-discovered evidence claims predicated upon post-conviction DNA testing. We hold that the same standard applies to all after-discovered evidence claims, regardless of the character of the new evidence, including DNA evidence. Accordingly, we affirm.

Willis was found dead in her home on October 5, 2001. The house lacked electricity and running water and was filled with trash and disordered furniture. The windows were boarded up, and the front door could be locked only by sliding a piece of wood from a bed slat into the door handle. Willis was addicted to crack cocaine and was known to allow other addicted persons to use crack cocaine in her home in exchange for drugs and money. She also permitted people to live in her home or to have sex with her in exchange for drugs or money. For instance, Willis rented rooms to Michael Cannon and Karen Thomas. Cannon paid Willis $50 twice per month for a room on the third floor, and sometimes paid Willis for sex. Cornell Mayrant also spent considerable time at the house and was in an intimate relationship with Willis. As a result, at the time of her murder, Willis' home was frequented by many people who shared her drug addiction.

A few years before Willis was murdered, Murchison had rented a room from her. At the time of the murder, Murchison no longer lived there, but he had continued to spend time with Willis at the home since moving out. The two engaged in a practice whereby Murchison would steal clothes from the retail store that employed him, and Willis, in turn, would sell the stolen clothes on the street. They would then use the profits to purchase crack cocaine.

In July 2001, Cannon, who was not addicted to cocaine but consumed alcohol every day, rented a room from Willis. Cannon awoke daily at 6:00 a.m. and departed around 6:45 a.m. in order to meet friends and spend the day drinking. Each evening he would purchase a bottle of alcohol on the way home and would return to his room and drink until he fell asleep. On the evening of October 4, 2001, Cannon returned home to his room, as usual. At around 11:00 p.m., Cannon heard Willis call his name, but he ignored her because he suspected that she was going to ask him for money. Cannon did not hear any sounds of a struggle thereafter.

The next morning, Cannon awoke at his usual time. On his way out of the house, Cannon twice walked by Willis, who lay sprawled on the couch. Cannon believed that Willis was sleeping. Because of the boarded-up windows and lack of electricity, the room was very dark. When Cannon returned home that evening, he observed Willis in the same position on the couch. The room still was dark, and Cannon could not see Willis clearly. Cannon did not attempt to interact with Willis and, instead, returned to his room with the bottle of alcohol that he had brought home. After finishing the bottle, Cannon decided to leave the house to purchase another bottle before the liquor store closed at 9:00 p.m. When Cannon entered the living room, he again noticed that Willis was still on the couch. Thinking it odd that she had not moved, Cannon approached Willis, intending to wake her. In the darkness, Cannon shook Willis, and quickly realized that she was dead. Unbeknownst to Cannon, who could not see clearly in the darkness, there was dried blood on Willis' face. Cannon also was standing in a pool of blood that had gathered on the floor next to the couch. Willis was not wearing any pants, and her underwear was strewn on the floor next to the couch. Because there was no phone in the house, Cannon

asked a neighbor to call the police. The neighbor refused. Cannon walked to a payphone and called the police himself.

When police officers responded, they had to use flashlights to investigate the dark crime scene. The police officers and other first responders found the wooden bed slat that was used to secure the front door lying on the floor next to the couch. There was blood on the wooden slat, which suggested to investigators that it had been against Willis. It also appeared to investigators that Willis had been beaten with fists. A toy fire truck was recovered atop the wooden slat, and officers found a white towel and a gray blanket on the floor near the couch. Investigators collected all of these items as evidence for forensic DNA testing. Because some blood was found on Cannon when police officers arrived, investigators also collected Cannon's boxer shorts, jeans, and socks. None of the pre-trial DNA testing that was performed on any of these items linked Murchison to the scene.

Willis had been dead for a significant period of time before police officers arrived. The medical examiner estimated that Willis had been killed between midnight and noon on October 5, 2001, or possibly even earlier. Following autopsy, Willis' cause of death was determined to be asphyxiation by manual strangulation. Willis' body also exhibited extensive bruising and other indicia of blunt force trauma, all consistent with strikes from a blunt object. Toxicology tests revealed that Willis had ingested cocaine up to an hour before her death. Although Willis was found naked from the waist down, there was no evidence of sexual assault. No semen was found in or on Willis. No fingerprint evidence linked Murchison to Willis' murder. Investigators found no fingerprints on the wooden slat

that they believed had been used to assault Willis. A partial fingerprint from the toy truck proved insufficient for identification.

Police officers interviewed Thomas, one of the house's occupants, on the night of October 5, 2001. Thomas stated that, sometime between 2:00 and 3:00 a.m. on October 5, 2001, she ran into Murchison on the sidewalk about two blocks from Willis' house. Murchison was carrying a bag of clothing that he was attempting to sell. Thomas asked Murchison where he was coming from. Murchison responded that he had just been to Willis' house and "that bitch put me out."[4] Murchison asked Thomas if she knew to whom Willis usually sold the stolen clothes. When Thomas declined to answer the question, the two parted ways. When talking to the police investigators, Thomas referred to Murchison only as "Derrick," because she did not know his last name.

The investigation into the murder then stalled. There was no evidence against Cannon, aside from his discovery of Willis' body. Police officers investigated Mayrant because of his apparent relationship with Willis, but found no evidence suggesting that he was the person who killed her. Police suspected "Derrick" based upon their interview with Thomas, but, at the time, they did not know that "Derrick" was Murchison. This changed three months later, when Carolyn Hunt, the mother of two of Murchison's children, called police and reported that Murchison had confessed to Willis' murder.

Hunt and Murchison had been estranged until Murchison began calling her in 2001 in order to speak to their children. In January 2002, Murchison went to Hunt's house and asked to talk with her. Hunt could tell that Murchison was high and, because it appeared to her that he had been sleeping on the street, she did not let him into her home. Instead,

---

[4] PCRA Ct. Op., 6/25/2020, at 3.

they talked in her car. Murchison asked if she had heard about what happened to Willis. Hunt told him that she had heard that Willis had been raped and beaten to death. Murchison replied, "that's not how it happened."[5] Murchison explained that Willis had not been raped, that he and Willis had been spending time together getting high and selling the stolen clothes. On the night of the murder, Willis "came back short" on the money that she was supposed to give Murchison.[6] Murchison and Willis began to argue. Murchison then punched Willis in the face until she passed out. When Willis came to, Murchison started choking her. Willis again passed out, and again came to. Murchison told Hunt that he then "grabbed the stick and he hit her with the stick."[7]

Terrified of what she had heard, Hunt sent Murchison away. Fearing for her children's safety, Hunt moved them to another school so that Murchison could not find them. Hunt told her sister and her mother about the confession. After a week of trying to figure out what to do, Hunt called police and reported Murchison's confession. Officers soon arrested Murchison for the murder.

Murchison later wrote Hunt a letter from jail in which he insisted that Willis was "like that when I found her."[8] Murchison warned Hunt that she should "think about what [she was] saying," because she "made a very, very big mistake."[9] Hunt considered this to be a threat. Hunt's sister, Nola Rutledge, corroborated Hunt's testimony. Rutledge testified

---

[5]    N.T., 6/15/2004, at 86 (R.R. at 345a).

[6]    N.T., 6/15/2004, at 86 (R.R. at 345a).

[7]    N.T., 6/10/2004, at 132-33 (R.R. at 204a-05a).

[8]    N.T., 6/10/2004, at 143 (R.R. at 207a).

[9]    N.T., 6/10/2004, at 143 (R.R. at 207a).

that, in January 2002, Hunt told Rutledge about Murchison's confession and that Hunt responded by transferring her children to another school in order to protect them from Murchison.

Investigators found Hunt's report of Murchison's confession to be particularly credible because it matched information they already had, including Thomas' reference to "Derrick," the lack of evidence of any kind of sexual assault, the use of the wooden slat, and the cause of death finding of manual strangulation, a process known to be slow and in which the victim often passes out and sometimes revives.

Pursuing this new information, police officers interviewed Dasheika Bowie, the mother of four of Murchison's children, with whom Murchison had been living in October 2001. According to Bowie, at the beginning of October 2001, when she and Murchison shared a residence, Murchison disappeared for a few days. Because of Murchison's drug addiction, it was not unusual for him to disappear for a while at the beginning of the month after he received his welfare check. When Bowie next encountered Murchison, it looked to Bowie as if Murchison had been in a fight. Murchison had a black eye, scratches on his face, and a busted lip. Murchison explained that he had gotten into a fight with a man and that the man's girlfriend had jumped in. Murchison told Bowie that he hit the girlfriend with a stick. The man told Murchison to "finish her off."[10] Murchison told Bowie that he declined and that both men left the house without knowing whether the girlfriend was dead or alive.[11] Murchison did not identify the woman, but did explain that the fight had been over crack cocaine.

---

[10] PCRA Ct. Op. at 3 (quoting N.T., 6/9/2004, at 175 (R.R. at 151a)).

[11] *Id.*

After police officers arrested Murchison, he twice attempted to escape. On August 3, 2002, Murchison attempted to escape the police station by climbing through the ceiling of an interview room while awaiting interrogation. He was quickly apprehended. In the second attempt, a Sheriff's detective thwarted Murchison's attempt to escape an interview room at the courthouse by climbing through a circulation vent in the ceiling. The Commonwealth later would rely at trial upon these escape attempts in order to establish Murchison's consciousness of guilt.

In addition to the evidence summarized above, the Commonwealth introduced DNA evidence from the crime scene. None of that DNA evidence implicated Murchison. DNA material taken from Willis' fingernails excluded Cannon, Mayrant, and Murchison, and instead revealed contributions from two unknown males. The medical examiner testified that, in cases of manual strangulation, victims often scratched their own neck rather than their attacker. The medical examiner further explained that DNA material could remain for a long time under the fingernails of someone with poor hygiene.

Blood samples from the toy fire engine showed Willis as the source. DNA material recovered from blood stains on the wooden slat also belonged to Willis. Attempts to obtain fingerprints from the wooden slat proved unsuccessful.

DNA testing of blood and semen stains found on the gray blanket identified Willis as the contributor of the blood and excluded Mayrant, Cannon, and Murchison. Partial DNA profiles of at least three unknown male contributors were recovered from semen deposits on the blanket. DNA testing of semen deposits found on the white towel excluded Murchison and Mayrant and could not exclude Cannon. DNA from two unknown males also was found in the semen on the towel.

DNA from a blood stain on Cannon's sock included Willis as a contributor. DNA testing available at the time of trial did not identify contributors to blood found on Cannon's boxers and jeans but could not exclude Willis as the source.

Without forensic evidence connecting Murchison to the crime scene, the Commonwealth relied heavily upon testimony from Cannon, Thomas, Bowie, and Hunt.

On June 16, 2004, a jury found Murchison guilty of first-degree murder, possession of an instrument of crime, and escape.[12] On August 10, 2004, the trial court sentenced Murchison to life in prison without the possibility of parole.

After reinstating Murchison's appellate rights *nunc pro tunc*, the Superior Court affirmed his judgment of sentence.[13] On October 17, 2008, this Court denied *allocatur*.[14] On January 9, 2009, Murchison filed a PCRA petition alleging that his trial and appellate counsel were ineffective. The PCRA court dismissed the petition without an evidentiary hearing and, on May 3, 2011, the Superior Court affirmed.[15]

Advances in DNA testing technology in the years since Murchison's conviction include new recovery techniques, especially what is now known either as touch DNA or contact trace DNA. This is a forensic method for analyzing trace amounts of DNA left at the scene of a crime, and includes, for example, skin cells from an object that has been

---

[12] *See* 18 Pa.C.S. §§ 2502(a), 907, and 5121(a), respectively.

[13] Murchison's name is misspelled in these prior appeals as Murchinson. *See Commonwealth v. Murchinson*, 899 A.2d 1159 (Pa. Super. 2006) (affirming the judgment of sentence because Murchison waived his appellate claims); *Commonwealth v. Murchinson*, 708 EDA 2007 (Pa. Super. Apr. 28, 2008) (reinstating Murchison's appellate rights *nunc pro tunc*) (unpublished).

[14] *Commonwealth v. Murchison*, 286 EAL 2008 (Pa. Oct. 17, 2008) (*per curiam*).

[15] *Commonwealth v. Murchison*, 1574 EDA 2010 (Pa. Super. May 3, 2011).

handled or touched, or cells from footprints. This new technology enables the collection of DNA from traces of blood, skin cells, sweat, semen, tears, or mucus that may remain on a surface.

On October 18, 2012, Murchison filed a petition for post-conviction DNA testing.[16] On June 13, 2013, the PCRA court granted the petition and ordered DNA testing of certain evidentiary items that remained in Commonwealth custody. After the testing was complete, on September 4, 2015, Murchison filed a PCRA petition alleging that the new DNA test results met the criteria for after-discovered evidence under the PCRA. The case then was continued several times to await the conclusion of additional DNA testing.

Murchison's claim ultimately rested upon three reports, dated June 15, 2015, July 6, 2015, and May 4, 2016. These reports compared the new DNA findings to the results of the initial pretrial testing. Pretrial forensic testing of blood stains on the wooden slat established the presence of DNA consistent with Willis' genetic profile and did not detect DNA from any other contributor. The results of the new DNA testing revealed the presence of trace DNA from an unknown contributor who could not have been Murchison. Mayrant could not be excluded as a contributor to the trace DNA deposited from an area of the slat that was not blood-stained.

Pretrial DNA testing proved that Willis was a contributor to a blood stain on the heel of Cannon's sock. The new testing showed the presence of DNA from a second, unknown contributor. The testing conclusively determined that this additional contributor was not Murchison. Pretrial DNA testing did not identify contributors to a blood stain on

---

[16]    *See* 42 Pa.C.S. § 9543.1.

Cannon's boxer shorts and did not exclude Willis as the source. The new testing identified Willis as the source of that blood.

Pretrial DNA testing detected three unknown contributors for the semen found on the blanket. The new DNA testing excluded Murchison from this group, and even established a fourth unknown male contributor.

Pretrial DNA testing could not exclude Cannon as a contributor to the semen found on the towel, excluded Mayrant and Murchison, and identified two unknown contributors. The new DNA testing likewise excluded Murchison as a contributor to the semen and confirmed the existence of two unknown male contributors.

In his PCRA petition, Murchison argued that these new DNA test results constituted after-discovered evidence that entitled him to relief under Section 9543(a)(2)(vi). That section requires a petitioner to "plead and prove by a preponderance of the evidence" "[t]hat the conviction or sentence resulted from" "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced."[17] Murchison argued that, because all of the DNA testing had excluded him as a contributor, the new DNA testing was necessarily exculpatory.

Murchison sought a new trial, or, in the alternative, an opportunity to negotiate a new plea deal with the Commonwealth. Murchison offered to plead *nolo contendere* to third degree murder and to possession of an instrument of crime in exchange for a reduced sentence of twenty to forty years of incarceration. On July 9, 2019, the Commonwealth submitted a letter to the PCRA court asserting that, "after thoroughly

---

[17]    42 Pa.C.S. § 9543(a).

reviewing the DNA testing results and the trial notes, the Commonwealth will agree to PCRA relief."[18] The Commonwealth agreed to accept Murchison's plea offer.

On October 29, 2019, the PCRA court nonetheless provided notice of its intent to dismiss the PCRA petition without an evidentiary hearing.[19] On November 15, 2019, Murchison filed a reply to the dismissal order. On November 27, 2019, the PCRA court dismissed the petition as untimely and without merit. On December 17, 2019, Murchison filed a notice of appeal to the Superior Court.

The PCRA court did not order Murchison to file a concise statement of errors complained of on appeal.[20] On June 25, 2020, the PCRA court issued an opinion pursuant to Pa.R.A.P. 1925(a). The PCRA court changed its mind about the timeliness of the petition but explained that the petition nonetheless failed on the merits.

In order to obtain relief on an after-discovered evidence claim under Subsection 9543(a)(2)(vi) of the PCRA based upon the results of the recent DNA testing, Murchison was required to prove the following:

> (1) the exculpatory evidence has been discovered after trial and could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict.[21]

The PCRA court found that Murchison was unable to establish that the recent DNA testing results were not cumulative or that they would likely compel a different verdict.

---

[18] *See Commonwealth v. Murchison*, 294 A.3d 1251, 1258 (Pa. Super. 2023 (*en banc*) (quoting Commonwealth letter, 7/9/2019).

[19] *See* Pa.R.Crim.P. 907.

[20] *See* Pa.R.A.P. 1925(b).

[21] *Commonwealth v. Burton*, 158 A.3d 618, 629 (Pa. 2017).

As for cumulativeness, the PCRA court found that none of the recent DNA test results revealed anything new, and that they were cumulative of the evidence already established at trial. With regard to the wooden slat, the PCRA court acknowledged that the new DNA evidence excluded Murchison a contributor. The PCRA court observed that the trial DNA evidence also had demonstrated that Murchison's DNA was not on the wooden slat, yet the jury had chosen to convict him. The PCRA court noted that the jury also had been informed that Murchison was not one of the contributors of the semen on the towel or blanket. According to the PCRA court, the only truly new evidence from the new DNA testing "is that the DNA on Cannon's sock came from Willis and an unknown person."[22] At trial, the jury had learned that the DNA from Cannon's sock came from Willis, but it had not learned of the unknown person's DNA.

The PCRA court found that none of the new DNA evidence was exculpatory and that it would not have changed the outcome of the trial:

> The fact that [Murchison's] DNA was not found on these items, particularly the wooden slat, is meaningless and does not establish his actual innocence of killing Willis by strangulation. What renders it even more meaningless is that the jury was presented with this same evidence at trial— that [Murchison's] DNA was **not** detected at the crime scene—and the jury still chose to find [Murchison] guilty of Willis' murder. Furthermore, the medical examiner determined that Willis's cause of death was manual strangulation, not trauma caused by the wooden slat. Thus, whether [Murchison] was excluded as a source of DNA on the wooden slat in no way establishes his actual innocence since the wooden slat was not even the murder weapon.[23]

The PCRA court was convinced that the jury convicted Murchison of Willis' murder not because of the DNA evidence but because Willis was strangled, because Thomas

---

22      PCRA Ct. Op., 6/25/2020, at 8.

23      PCRA Ct. Op., 6/25/2020, at 9-10 (emphasis in original, internal citation omitted).

placed Murchison near Willis' house with a bag of stolen clothes, and because of Murchison's confessions to Hunt and Bowie. In light of the "overwhelming witness testimony" presented at trial, the PCRA court concluded that the new DNA test results would not likely compel a different result, and that no relief was due.[24]

On appeal, Murchison argued that he was entitled to relief because the new DNA evidence revealed that someone—not him—left blood at the crime scene and touch DNA on the wooden slat. Murchison asserted that this new evidence contradicted the Commonwealth's theory of the case and that, if that evidence had been introduced at trial, the jury would have reached a different outcome. Murchison also argued that the PCRA court applied the wrong legal standard when it evaluated this claim.

Initially, a divided three-judge panel of the Superior Court affirmed the denial of PCRA relief. Murchison applied for reargument, which the Superior Court granted. Sitting *en banc*, the Superior Court affirmed the PCRA court's order in a divided, five-to-four opinion.[25] The Superior Court majority rejected Murchison's arguments for the same reasons offered by the PCRA court, and it supplemented the PCRA court's analysis in several respects. The Superior Court observed that, in comparison to the trial evidence, the new DNA testing revealed that:

> (1) testing of the wooden slat presented [Willis'] DNA, as well as the presence of trace DNA from an unknown contributor who could not have been [Murchison]; (2) there was the presence of a second, unknown contributor in the blood stain found on Cannon's sock and [Murchison] was excluded as a contributor; (3) [Willis] was the source of blood detected on

---

[24]     PCRA Ct. Op., 6/25/2020, at 10.

[25]     *Commonwealth v. Murchison*, 294 A.3d 1251 (Pa. Super. 2023) (*en banc*).

Cannon's boxer shorts; and (4) a fourth unknown contributor was found as to the semen stains on the blanket.[26]

The Superior Court viewed the new DNA testing as providing no substantial change from the evidence that was introduced at trial except that Willis' blood was officially confirmed on Cannon's boxer shorts and that Murchison was excluded as the unknown contributor on the wooden slat. The fact that Willis' blood was found on Cannon's boxer shorts was, according to the Superior Court, not surprising given Cannon's testimony that he attempted to wake Willis up by shaking her. There was also evidence that Willis' nose was caked with blood, that blood was coming out of her ear, and that blood was on the floor. The Superior Court reasoned that the jury could have inferred that Cannon got some of Willis' blood on his clothing when he reached down and touched her.

The Superior Court opined that, although the new DNA testing revealed the presence of an unknown contributor on the wooden slat, "this cannot be viewed as consequential concerning the outcome of the trial when looking at the other evidence."[27] This other evidence included the fact that the official cause of death was manual strangulation and the evidence that Willis allowed other drug-addicted individuals to use drugs in her house, rented rooms to boarders, and engaged in prostitution in her house. The presence of unknown contributors at the scene did not convince the Superior Court that there may have been another perpetrator. The Superior Court emphasized the testimony that put Murchison in the vicinity of Willis' home around the time of the murder,

---

[26]     *Id.* at 1263.

[27]     *Id.*

that Murchison was observed to have significant scratches and injuries on his person, and that he had confessed to killing Willis.

The Superior Court disagreed with Murchison's argument that the PCRA court applied the wrong legal standard to evaluate his after-discovered evidence claim. Although the PCRA court referred to "actual innocence," it did so only when it was examining cases holding that "negative DNA results, meaning cases where a person's DNA material is not found, do not establish actual innocence."[28] The Superior Court determined that the PCRA court's statement did not go to the legal standard but, rather, to the inferences that can or cannot be drawn from DNA test results.

Judge Olson authored a dissent (joined by Judges Dubow and Kunselman), predicated on three bases. First, the dissent disagreed that the new DNA testing results were cumulative of the trial evidence; contrary to the PCRA court's findings, the jury at the 2004 trial never learned that Willis was included as a contributor to the blood stains found on Cannon's boxer shorts and socks. Rather, the jury learned only that Willis could not be excluded as a contributor. Judge Olson also observed that the PCRA court failed to acknowledge that the new DNA testing of the wooden slat revealed trace DNA from an unknown contributor, a fact that the jury never heard.

Second, the dissent believed that this new evidence was exculpatory and would have changed the outcome of the trial had it been introduced. In particular, the dissent opined that, had the jury heard that Willis' blood was found on the boxer shorts of Cannon, her occasional sexual partner, it would have connected Cannon to the murder. Similarly,

---

[28] PCRA Ct. Op., 6/25/2020, at 9 (emphasis omitted) (citing *Commonwealth v. Brooks*, 875 A.2d 1141, 1147 (Pa. Super. 2005)).

the dissent believed that the new testing results confirming the presence of DNA from unknown contributors in genetic material recovered from Cannon's sock and the wooden slat would "present a treasure trove of ammunition to a skilled trial advocate representing a defendant who could not be connected by physical evidence to a particular offense."[29]

Third, the dissent opined that, in relying upon cases concerning a petitioner's threshold request for post-conviction DNA testing under Section 9543.1(c),[30] the PCRA court applied the wrong legal standard. Although petitioners seeking testing under Section 9543.1(c) must make a *prima facie* demonstration that exculpatory results would establish actual innocence, petitioners seeking relief under claims of after-discovered evidence are not required to do so. The dissent believed that the PCRA court's reliance upon cases decided under Section 9543.1 resulted in the use of an irrelevant legal standard in order to evaluate Murchison's claim. For these three reasons, Judge Olson would have awarded Murchison a new trial.

Judge Nichols also dissented, agreeing with Judge Olson that the PCRA court applied an incorrect legal standard. Judge Nichols believed that this legal error warranted vacating the PCRA court's order and remanding for the PCRA court to reevaluate the after-discovered evidence claim under the correct legal standard.

We granted Murchison's petition for allowance of appeal in order to decide the following issue:

> Whether the Superior Court applied the correct standard for an after-discovered evidence claim based upon post-conviction DNA testing

---

[29]   *Murchison*, 294 A.3d at 1270 (Olson, J., dissenting).

[30]   Requests for post-conviction DNA testing require a *prima facie* showing that DNA testing of specific evidence, assuming exculpatory results, would establish the petitioner's "actual innocence." 42 Pa.C.S. § 9543.1(c).

received pursuant to Section 9543.1 of the PCRA and what value the jurisprudence related to a standard of actual innocence provides to that analysis.[31]

Murchison argues that the PCRA court held Murchison not to the burden of proving an after-discovered evidence claim, but to the higher burden necessary to obtain post-conviction DNA testing—actual innocence. According to Murchison, not only did the PCRA court rely upon cases applying the actual innocence burden to requests for post-conviction DNA testing, the PCRA court also twice held that Murchison failed to establish his actual innocence. Murchison argues that the Superior Court wrongly endorsed this approach.

Murchison argues that the lower courts failed to appreciate that the new DNA evidence warrants relief because it is of a higher grade or character than what was known at trial,[32] failed to consider the significance of the new evidence to the Commonwealth's theory of the case,[33] and failed to analyze whether the new evidence might lead a jury to convict Murchison of a lesser degree of murder.

In its brief, the Commonwealth agrees with Murchison. The Pennsylvania Innocence Project has filed an *amicus curiae* brief on behalf of Murchison, arguing that

---

[31] *Commonwealth v. Murchison*, 315 A.3d 830 (Pa. Mar. 20, 2024) (*per curiam*).

[32] *See Commonwealth v. Small*, 189 A.3d 961, 975-76 (Pa. 2018) (holding that "evidence which is corroborative or cumulative, but not 'merely' so—that is, the new evidence is of a higher grade or character than what was previously presented on a material issue—may properly be used to support the grant of a new trial").

[33] *See Commonwealth v. Bulted*, 279 A.2d 158, 161-62 (Pa. 1971) (examining the emphasis that the district attorney placed on trial evidence in evaluating the significance of after-discovered evidence).

no state with a post-conviction DNA testing scheme requires proof of actual innocence in order to obtain a new trial based upon post-conviction DNA testing.

As *amicus curiae* on behalf of the Commonwealth, the Attorney General argues that the standard for after-discovered evidence is well-settled and is not in dispute in this case. Further, according to the Attorney General, both of the lower courts correctly applied this standard, and neither court required Murchison to establish actual innocence. The real issue in the case, according to the Attorney General, is the application of the after-discovered evidence standard to the facts presented. Examining these facts, the Attorney General argues that the new DNA evidence, as well as the absence of adversarial testing by the Commonwealth, is not likely to compel a different jury verdict. In particular, according to the Attorney General, the blanket and towel only contained irrelevant DNA; the DNA on the wooden slat was most likely the victim's; the DNA on Cannon's sock was most likely from Cannon; and the jury already determined that the blood on Cannon's boxers was insignificant.

When we review the denial of PCRA relief, we inquire whether the PCRA court's findings are supported by the record and without legal error.[34] Our review over questions of law is *de novo*.[35] Our "scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable

---

[34] *Commonwealth v. Edmiston*, 65 A.3d 339, 345 (Pa. 2013).

[35] *Id.*

to the prevailing party . . . ."[36]   The petitioner bears the burden to prove, by a preponderance of the evidence, that he or she is eligible for PCRA relief.[37]

We agree with the Attorney General that there is no dispute among the parties or among our precedents as to the standard applicable to an after-discovered evidence claim.  In seeking to demonstrate eligibility for relief under the PCRA, the burden of proof is on the petitioner, who must make this showing by a preponderance of the evidence.[38] For a claim of after-discovered evidence, the petitioner must show that the conviction "resulted from . . . [t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced."[39]

In order to prevail under Section 9543(a)(2)(vi), a petitioner must prove that the after-discovered evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.[40]

Several case-specific factors inform the analysis of whether the petitioner has established by a preponderance of the evidence that the after-discovered facts would

---

[36]   *Commonwealth v. Fahy*, 959 A.2d 312, 316 (Pa. 2008).

[37]   42 Pa.C.S. § 9543.

[38]   42 Pa.C.S. § 9543(a) ("To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following: . . . .").

[39]   42 Pa.C.S. § 9543(a)(2)(vi).

[40]   *Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008); *see also Small*, 189 A.3d at 972; *Commonwealth v. Cox*, 146 A.3d 221, 228 (Pa. 2016).

likely produce a different result.  In *Bulted*, for example, the Court reviewed all of the trial evidence, as well as the Commonwealth's closing argument, in order to assess the impact of the after-discovered evidence.[41]   In *Commonwealth v. Mount*,[42] the Court analyzed the impact of the after-discovered evidence against the Commonwealth's theory of the case.  In *Commonwealth v. Cooney*,[43] the Court held that after-discovered evidence entitled the petitioner to relief because it supported and confirmed the petitioner's trial testimony and rendered the defense theory much more plausible.

This precedent demonstrates that the only way to assess the likelihood that after-discovered evidence will produce a different result is to review the totality of all of the trial circumstances, including, but not limited to, the trial evidence and the parties' closing arguments.  When the petitioner establishes by a preponderance of the evidence that the new facts are "of such a nature and character that a different verdict will likely result if a new trial is granted," then the petitioner is entitled to relief.[44]

In contrast, the "actual innocence" standard is a necessary component of Section 9543.1, which authorizes post-conviction DNA testing "for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice."[45]   Section 9543.1(c)(2)(i) requires the petitioner to make a

---

[41]     *See* 279 A.2d at 159-162.

[42]     *See* 257 A.2d 578, 582 (Pa. 1969).

[43]     282 A.2d 29, 31 (Pa. 1971).

[44]     *Commonwealth v. Valderrama*, 388 A.2d 1042, 1045 (Pa. 1978) (holding that the after-discovered evidence provided substantial support for the defendant's alibi defense and that a different verdict would likely result).

[45]     42 Pa.C.S. § 9543.1(a)(4).

sworn statement asserting actual innocence.[46]  Section 9543.1(c)(3) requires the petitioner to establish a *prima facie* case that, assuming exculpatory results, the DNA testing would establish actual innocence.[47]

This standard requires reviewing courts to evaluate the extent to which the petitioner's assertions demonstrate a *prima facie* case of actual innocence.  Several Superior Court cases have held that, when the petitioner believes that the DNA testing will reveal the absence of the petitioner's DNA at the crime scene, such negative DNA test results do not necessarily establish the petitioner's actual innocence.[48]  However, once the petitioner obtains the DNA testing and new evidence is discovered, there is no dispute that Section 9543.1(f)(1) directs the petitioner back to the provisions governing the eligibility for relief for claims of after-discovered evidence.[49]

A claim of after-discovered evidence based upon post-conviction DNA testing obtained under Section 9543.1 does not require proof of actual innocence.  This is

---

[46]     *Id.* § 9543.1(c)(2)(i).

[47]     *Id.* § 9543.1(c)(3).

[48]     *Commonwealth v. Smith*, 889 A.2d 582, 586 (Pa. Super. 2005) (holding that the petitioner's *prima facie* case for the significance of the absence of his DNA from the victim's fingernails failed because "even if DNA testing were to generate the result that [the petitioner] anticipates—absence of his DNA from the victim's fingernails—this would not establish his innocence of her murder"); *Brooks*, 875 A.2d at 1147 (holding that DNA test results would not establish actual innocence because "[t]his is not a rape-murder case where the absence of the defendant's semen could prove his innocence; or a case where there were signs of a struggle and the perpetrator left behind skin, hair, or blood samples"); *Commonwealth v. Heilman*, 867 A.2d 542, 547 (Pa. Super. 2005) (holding that negative DNA test results showing the absence of the petitioner's DNA at the crime scene would not establish actual innocence because "an absence of evidence is not evidence of absence").

[49]     42 Pa.C.S. § 9543.1(f)(1) (directing the petitioner to file a PCRA petition under Section 9543(a)(2)(vi) (pertaining to claims of after-discovered evidence)).

indisputable. The PCRA is clear, as is our precedent. The parties and their *amici* agree. The standard of proof for a claim of after-discovered DNA evidence is the same as for every other claim of after-discovered evidence.

This also is consistent with the reasoning of the Superior Court majority. Writing for that majority, Judge, now Justice, McCaffery specified that the court was relying upon the PCRA standards for after-discovered evidence in Section 9543(a)(2)(vi), and was not requiring proof of actual innocence.[50] The two dissenting opinions in the Superior Court also reviewed the new DNA evidence under the standard of Section 9543(a)(2)(vi). The Superior Court majority and the two dissenting opinions each applied the correct legal standard for evaluating after-discovered evidence claims based upon post-conviction DNA testing.

Murchison's argument is directed at the PCRA court's analysis. The PCRA court, in recognizing that Murchison was raising an after-discovered evidence claim, noted that, in order to prevail, Murchison had to prove that the evidence met the four requirements articulated above. The PCRA court began its analysis by correctly invoking this standard[51] and ultimately ended the analysis by concluding that the standard was not met.[52] In reaching this conclusion, the court held that none of the after-discovered evidence was likely to result in a different verdict because it was not exculpatory,

---

[50]     *Murchison*, 294 A.3d at 1261, 1264.

[51]     PCRA Ct. Op., 6/25/2020, at 8.

[52]     *Id.* at 10 (concluding that Murchison was "unable to show that his newer DNA testing results would likely compel a different verdict").

explaining that "negative DNA results, meaning cases where a person's DNA material is not found, do not establish actual innocence."[53]

While the PCRA court relied upon Superior Court cases applying the actual innocence standard under Section 9543.1, it is clear to us that the court did so only as a shorthand for evaluating whether the evidence, if produced at a new trial, would be likely to result in a different verdict. In its citation to this standard and to the cases applying it, the PCRA court was discussing the inference that could, or could not, be made from negative DNA test results in light of the circumstances of the case, an inference that is pertinent to assessing whether the after-discovered evidence likely would result in a different verdict. The court did not import the actual innocence standard into this after-discovered evidence analysis. Instead, the court merely assessed the impact of the after-discovered evidence in the context of the unique circumstances of this case. Examining the case that the Commonwealth presented against Murchison at trial, the PCRA court concluded that Murchison was convicted because of the testimony against him, and that the new DNA testing would not have compelled a different result.

Murchison's after-discovered evidence claim failed in the courts below because Murchison did not establish that the new DNA evidence was not merely corroborative or cumulative of the trial evidence, nor did he prove that the new evidence would likely compel a different verdict. The record supports the lower courts' conclusions in this regard. The new DNA testing discovered DNA from an unknown contributor on the wooden slat, identified an unknown contributor to the DNA found on Cannon's sock,

---

[53] PCRA Ct. Op., 6/25/2020, at 9 (emphasis omitted) (citing *Brooks*, 875 A.2d at 1147 (holding that negative DNA results do not establish actual innocence)); *Heilman*, 867 A.2d at 547 (same); *Smith*, 889 A.2d at 586.

confirmed that Willis was the source of blood found on Cannon's boxer shorts, and identified a fourth unknown contributor to the semen stains on the blanket.

With respect to the wooden slat, the fact remains that Willis was killed by manual strangulation. The slat was not a murder weapon. The absence of Murchison's DNA on the wooden slat is evidentiarily neutral: it neither implicates nor exculpates Murchison. The presence of an unknown contributor on the wooden slat and the DNA in Cannon's sock fits within the trial evidence regarding the transitory nature of Willis' home and the several individuals who visited it and used the wooden slat to lock the front door.[54] As the Commonwealth argued to the jury, the lack of water and basic hygiene in Willis' house allowed for the presence of irrelevant DNA all over the crime scene. And the after-discovered DNA evidence on the wooden slat and Cannon's sock neither placed Murchison at the scene of the crime nor excluded him.

The confirmation of Willis' blood on Cannon's boxer shorts also was addressed at trial by the Commonwealth's evidence that Cannon, believing Willis to be asleep and unable to see clearly in the dark room, shook Willis' blood-covered body to wake her up.

_____

[54] As *amicus*, the Attorney General asserts that the trace DNA newly discovered on the commonly touched wooden slat was a single allele, and the testing showed that it could have been Willis' DNA. The Attorney General also argues that the wooden slat was known to have been touched by many people, and the fact that the touch DNA was limited to a single allele demonstrates that the wooden slat did not absorb DNA as well as other materials might, proving only that not everyone who touched the wooden slat left their DNA behind, including the person who used the wooden slat to beat Willis.

As for Cannon's sock, the Attorney General explains that the after-discovered DNA evidence could have come from Cannon himself: "When Cannon found Ms. Willis' body, he had presumably been wearing that sock all day—possibly longer. It would not seem surprising to find his sweat or skin cells, which could now be tested for DNA in the material of his sock. What is surprising is that the newly discovered DNA was not compared to Cannon—the most likely contributor." Amicus Brief of Attorney General at 33 (emphasis omitted).

From this testimony the jury could have inferred that Willis' blood got onto Cannon's clothing.

The semen on the blanket and towel is irrelevant. This was not a sex crime. The Commonwealth did not tie Murchison to Willis sexually or through an allegation of sexual assault. Willis was known to prostitute herself for drugs and money, and the jury learned at trial that Murchison was excluded as a source of DNA on the towel and the blanket. When he confessed to Hunt, Murchison also confirmed that this was not a rape or a sexual assault. This was a fight over drug money.

The witness testimony that led the jury to convict Murchison is not undone by the post-conviction DNA testing evidence. Thomas observed Murchison near Willis' house around the time of the murder, and Murchison stated that he had just left Willis' house. Bowie encountered Murchison around the time of the murder and saw that he had a black eye and a busted lip. Murchison told Bowie that he had been in a fight and had hit a woman with a wooden stick. Murchison confessed to Hunt that he had beat and strangled Willis because she "came back short."[55] Murchison explained that the two had gotten into an argument about money, that the argument turned physical, that Murchison punched and choked Willis, that Willis passed out several times, and that Murchison strangled Willis and struck her with a wooden stick. Murchison also corrected Hunt's incorrect belief that Willis had been raped.

Taken together, the record supports the PCRA court's conclusion that the after-discovered DNA evidence does not demonstrate that a different outcome would be likely. The order of the Superior Court is affirmed.

---

[55] N.T., 6/15/2004, at 86 (R.R. at 345a).

Chief Justice Todd and Justices Donohue, Dougherty, Mundy and Brobson join the opinion.

Justice McCaffery did not participate in the consideration or decision of this matter.